The next case is number 23-1197, David Littlefield et al. versus United States Dept of the Interior et al. At this time, would counsel for the appellants, Littlefield et al., please introduce himself on the record to begin. Good morning, your honors. David Tennant on behalf of the Littlefield plaintiffs and appellants. Good morning. I would like to request three minutes of rebuttal time. You may have three minutes. Thank you, your honor. And in terms of focusing today's argument, I'd like to focus on what is our second point in our reply brief, namely that the Mashpeys did not exist as a common law defined tribe in 1934 and therefore do not exist under federal jurisdiction in 1934 within the meaning of the Indian Reorganization Act. And basically, logically, starting off as the initial point is that a tribe has to have been in existence in 1934 in order for it to have been under federal jurisdiction at that time. And the IRA, the Indian Reorganization Act, is plain on its face, the Supreme Court in Carcheri read the IRA to mean tribes in existence in 1934 that had to be under federal jurisdiction at that time. But aren't there two, I'm sorry, counsel, aren't there two separate processes for recognition of a tribe versus the question of whether they were under federal jurisdiction in 1934? So there's an entirely separate process that Mashpeys went through and they obtained recognition. That's correct, your honor. In 2007, pursuant to Part 83 of administrative regulations adopted in 1978, there's recognition for the group of Indians, Native Americans who were then recognized as a tribe. That doesn't take the place of what Congress intended in 1934 in using the word tribe and the tribe, the meaning of tribe as Congress understood it in 1934, was the Montoya and Candelaria common law test for tribe. Counsel, in Carcheri, and I apologize if I'm not saying the name correctly, the definition of tribe wasn't the issue in that case, right? The issue in that case is what did Congress mean by saying now under federal jurisdiction and they interpreted that to mean in 1934. So is there specific language in that case that you could point us to that says that case was also interpreting tribe? Well, it's not interpreting tribe as opposed to saying that at the time, the tribe, whatever that is, had to have been under jurisdiction, had to exist, had to have an actual existence in 1934, that that's what the district court, reciting the language of the IRA concluded, and it's specifically what the Supreme Court quoted the district court in recognizing that the tribe, as Congress understood it in 1934, had to be in existence. You can't have a nonexistent tribe under federal jurisdiction in 1934. It had to be in existence. And the only test that could have been available, the only definition known to Congress in 1934 was the Montoya test, which was in a Supreme Court case in 1901 and was further reaffirmed in Cantalaria in 1926. So in 1934, Congress could only have intended to adopt the common law standard for a tribe, and it doesn't matter whether there's subsequent... Counsel, let me frame this for you. I think your argument that carcieri had to be read differently is nonsense. I think your argument that this tribe has to be treated the way other tribes are treated is nonsense. I think your argument that the agency did not explain its position is nonsense. So can we get down to what I think are the issues in the case? Okay, so grab me that and don't argue those points. All right. You have decided to accept the M opinion by the Solicitor General. You have not challenged that. You have accepted the other circuit cases which say that those pass all of the normal APA tests. So you have waived any argument as to that. All right. So we are now down to... No, let me finish. We are now down to was the agency arbitrary and capricious when it applied its M opinion to the facts of this case? Okay. So the argument you're making, you have just spent a lot of time making, strikes me as an attack on the M opinion and an attack on Justice Breyer's concurring opinion which says sometimes the agency makes a mistake and the tribe even if it didn't recognize it later and the M opinion adopts the concurring opinion's view. So what is it now that we're down to the arbitrary and capricious test which makes this decision arbitrary or capricious? And if I could just comment, Your Honor, with respect to our position on the M opinion. We do not concede that the M opinion is correct in all respects and we have specifically challenged its approach to what we call the tag your it version of federal jurisdiction where the slightest example of a federal contact, for example, would be an act of federal jurisdiction even though the M opinion itself calls for an act or series of actions that something as simple and insignificant as one student attending a Carlisle school that closed 16 years before the IRA was passed is nonetheless evidence of federal jurisdiction. I believe you have misread the apartment's application of the M opinion. It did not turn on that single fact. In fact, it is quite explicit that this is a multifactored analysis to be weighed by the agency. So unless you can come up with more than this one argument, I think you're in trouble. Well, Your Honor, I will leave to our briefing what we stated about the M opinion and its limitations. We accept that the Justice Breyer's concurring opinion sets forth the controlling standards for significant, meaningful exercises of federal jurisdiction and not insignificant. The Amador decision out of the Ninth Circuit makes clear that the under federal jurisdiction requirement for Indian tribes in 1934 was intended to reach tribes that already had some significant connection to the federal government. And what we're saying here is that the Mashpee tribe had insignificant contacts that are indistinguishable from the insignificant contacts the Narragansett had, and that for purposes of review here, it would be for this court, having said in 1979 that the federal government never officially recognized or actively supported or watched over the Mashpees, and said that there's no continuing relationship with the federal government, that these are 100 percent consistent with the treatment of the Narragansetts and is fundamentally inconsistent with saying that the Mashpees have some type of meaningful, significant relationship with the federal government. But let's get back to Judge Lynch's original question, which is to focus you in on was the agency itself here arbitrary and capricious when it applied the M opinion to the facts of this case? What would you point us to to support that argument? Certainly, Your Honor. The fact that the Carlisle school attendance lapsed 16 years before the passage of the IRA, that is, you know, and the actual decision by Interior, the 2018 decision, vastly overstates the significance of this evidence. It refers to four different ways in which the Carlisle school attendance is probative, but it's all the same thing. School attendance, school census, school financial services, school medical care. Counsel, I'm sorry, I didn't, I'm sorry to interrupt. Why does it matter that because the school was closed and that particular policy was no longer being pursued, why does that matter to the analysis in 1934 if what we need to look at is whether there was an action or series of actions? So in other words, that seems to understand that it's going to be happening over a period of time. Right. But if you look at Justice Breyer's concurring opinion, he says in effect in 1934. So it's the congressional appropriation in effect in 1934, the federal treaty in effect in 1934. Enrollment with the Office of Civil and Indian Affairs in 1934. It's in effect. So basically what the M opinion is doing is ratcheting back and saying, well, Justice Breyer was focused on 1934. We're going to look at other things, other acts, other bits and pieces of historical evidence to try to cobble together something that shows this tribe was under federal jurisdiction without having to actually say anything about what's in effect in 1934. So your argument is that you can't look at anything other than what was happening in 1934, that it's by definition arbitrary and capricious to look at any evidence? No, Your Honor. I mean, well, for example, a federal treaty in 1796 would still be in effect in 1934, right? So the fact that there hasn't been some type of current, you know, that it hasn't actually had something happen in 1934 is not dispositive, but it's to have an effect in 1934. So any one of these contacts that was pre-1934 needs to have some kind of holdover effect that would be actually felt in 1934. Counsel, there was one argument you made that I thought was really quite It was commonly accepted, including by the leading Indian treatise at the time, that state jurisdiction and federal jurisdiction were mutually exclusive. Am I correct that that's one of the arguments you're making? Yes, Judge Lynch, that is correct. The fundamentally different state-recognized tribes are, by definition, not federally-recognized tribes, and that is reflective of the fact that states can sometimes exercise full jurisdiction over tribes without there being any type of jurisdiction exercised by the federal government, even if the federal government has continuing plenary power that isn't exercised. But the M opinion does not adopt that point of view, correct? The M opinion basically does not recognize a distinction between state and federal jurisdiction and tries to combine them and basically have, at record of the decision that's the subject of this appeal, they have pretty much abandoned any type of separation between state and federal jurisdiction because Massachusetts was so actively, heavily involved in the day-to-day supervision and jurisdiction of the Mashpees and other Massachusetts Indians that it becomes very difficult for the federal government to say that we still have some type of active role. And they have actually advocated the argument, although I don't think it's in the papers now, that the actions of the Commonwealth of Massachusetts should be taken as the actions of the federal government for purposes of under federal jurisdiction. I thought their argument was it doesn't really matter if the state also exercised jurisdiction. Under their interpretation, you can have both at the same time. Well, they do make that argument, but in the context of the Massachusetts Indians that were carved out from the 1796 ordinance and the fact that the federal government was not actually involved in the day-to-day administration of any affairs in Massachusetts. There was no Office of Indian Affairs ever in Massachusetts. And the fact is that the leading commissioner of Indian Affairs had stated that the Mashpees were not under federal jurisdiction. And that was repeated by a series of contemporaneous statements by interior officials. So there is a clear record here that the Mashpees, whatever was plenary federal power, they were not under federal jurisdiction. They were under the exclusive jurisdiction of the state. OK, if I just understood you, you're making both the legal argument and you're making an argument that even if you can have concurrent jurisdiction, state and federal, the facts here are insufficient to show federal jurisdiction. That's correct, Your Honor. So on and so forth. OK, thank you. Thank you. Thank you, counsel. At this time, counsel for the Appalachian U.S. Department of the Interior will please introduce himself on the record to begin. Good morning. Christopher Anderson from the Department of the Interior and Secretary Holland. I'd like to begin, Your Honors, if I may, with Judge Lynch's observation, which I absolutely agree with, which is that this case is about whether the department's determination was arbitrary and capricious. And I think the record here is extensive. I think the decision is well-reasoned. I think it's clear that the decision is not arbitrary. In particular, I note that my colleague focuses on whether the instances of determination by the department were sufficiently significant. And to my mind, significant is a term that requires a degree of judgment. And that judgment is the Secretary's. And Congress gave the Secretary that judgment for a reason, because these determinations are hard. They implicate matters of federal policy. They implicate matters of federal Indian relations. And for that reason, the Secretary's decision must be upheld unless it's wholly irrational or arbitrary. That's not the case here. And for that reason, it should be affirmed. If I could discuss the state jurisdiction point quickly. Yes, please. Please. So there is not a category in Indian law of exclusive state jurisdiction. This is something that simply does not exist. When the Constitution went into effect in 1789, the federal power over Indian affairs became plenary throughout the entire country, including Massachusetts. And this court has held as much in Passamaquoddy. It is true. Counsel, excuse me. I don't quite think that's the argument. I think the argument is a massive state exercise of jurisdiction over these individuals who may or may not be tribe members is a good indication of the absence of federal jurisdiction. And here, there are no, as of 1934, none of the usual indicia of federal jurisdiction. So I think the argument's a little more sophisticated than you're giving credit to. No, Your Honor. I agree. I was setting the stage before turning to the more specific point. And I agree that no one disputes that the Commonwealth exercised jurisdiction over the Mashpee in various ways throughout the 19th century. But first, I would say that doesn't mean that the federal government was also not exercising jurisdiction. And as early as the 1820s, the federal government was actively considering whether to remove the tribe by force to the Western territories. Now, ultimately, that didn't happen. But you can't meaningfully consider that. And the evidence is that it was considered at the highest levels of government without asserting that you have the authority to do so. And in this case, asserting you have the authority to do so because the Mashpee were an Indian tribe. So the fact that the Commonwealth undoubtedly did take actions towards the tribe is sort of neither here nor there, provided that this federal tribe relationship exists. And we think that the record amply supports that proposition. Further, I do think Passamaquoddy stands for this point, Your Honor. The fact that Massachusetts took actions towards the tribe cannot displace or oust federal jurisdiction if it's otherwise there. Could I ask a question? It's more of an intellectual interest because they've given up a Chevron attack on the M opinion. But why is everyone so sure that the concurring opinion from Justice Breyer, which is just one justice's view, is the prevailing law of the land and the prevailing law of the land? Well, I think, Your Honor, it's because the majority in Carchary didn't address what underfederal jurisdiction means. But that's my point. And Justice Breyer is the only person who did. And so the department had to in the first instance when it had to make these determinations figure out what underfederal jurisdiction meant. And I think it's natural that they looked at Justice Breyer's concurring opinion. But I would also note that the M opinion has since been upheld by two different courts of appeals, the Ninth Circuit and the D.C. Circuit. And there's a decision in the Second Circuit affirming a district court application of the M opinion without an appellate court opinion. So I think now we have a wider wealth of judicial views to draw on. But the M opinion, when it was issued, Justice Breyer's opinion was the best thing going. Can I ask you, counsel, if you could address moving back to the arbitrary and capricious issues, opposing counsel's argument that the closing of the Carlisle School is relevant to the analysis in some way? Sure. I don't think the closing of the Carlisle School is relevant. And that's because, as the department explains in the M opinion, once federal jurisdiction attaches, it persists unless it's terminated by an act of Congress. And I think what the rod in this case showed is that the attendance of Mashpee children at the Carlisle School, which is only possible because they were recognized to be Indian children, was a pretty thoroughgoing assertion of federal jurisdiction over the children and the tribe. And so once that attaches, as the M opinion explains, this is based on longstanding principles of Indian law, it cannot lapse unless Congress says so. I'm a little puzzled by that because the fact that some of the Mashpee children attended the Carlisle School does not itself absent other things and, I suspect, establish the existence of federal jurisdiction. So I don't see why the principle that once it is established, only Congress can oust, can revoke federal jurisdiction is at play here. Congress had not at that point recognized federal jurisdiction in the usual formal senses, correct? That is correct. Prior to the 1930s, Congress was not recognizing jurisdiction in this sense. But I think, as the Supreme Court held in United States v. John, once federal power is established, it can lapse for various periods of time. But that doesn't mean, lapse in the sense of there's no active involvement by the federal government, but that doesn't mean the power itself disappears once it attaches. I know, but it's this sort of Ron Boy effect. No one has ever found that the power existed until the Department of Interior said so in its conclusion here. When you're saying, once the department says so, it takes a congressional ruling, a congressional statement of ousting, dissolving that status. That cannot be true. Well, so respectfully, Your Honor, I think I would put it slightly differently. I think jurisdiction established during the 19th century because of the series of actions taken by the department, the national government, et cetera, over time. The department merely recognized that status in the rod. The department didn't establish that status in the rod. And so, it is this course of action. I'm sorry, my question still stands. Let me ask something else. The department believes that Justice Breyer is correct and has embodied his thought that, well, the department can make mistakes, and it can correct the mistakes after 1934. Correct? Yes, that is correct, Your Honor. Okay, so is the rod to be read two ways? One, it's clear that as of 1934, there was federal jurisdiction. And two, even if there wasn't, we now tell you it was a mistake not to have recognized it in 1934. So, again, I don't think quite that, Your Honor. I think the rod should be read to say that there was jurisdiction in 1934. Yes. And the fact that there are some statements in the 30s made in correspondence, mostly informal correspondence by interior officials that might suggest to the contrary that those statements in and of themselves do not call into question the broader decision that the tribe was under federal jurisdiction. And that is because those officials may have been mistaken as to the status of the tribe at that time. So that is the second argument. They were mistaken, and we can change our position. Yes, they were mistaken. And, again, respectfully, I don't think we would concede that that correspondence reflected an official position of the department at the time. Sure, sure. Thank you. If I may just quickly address the estoppel argument that was made in the reply brief. The United States is not estopped here from rejecting the 1978 jury verdict. The United States never argued that that jury verdict was correct. We did not participate in the litigation leading to the 1983 Court of Appeals decision. And in the second Court of Appeals decision, we did argue that the Mashpee were precluded from raising a Non-Intercourse Act claim against new defendants. But that is in no way the same as saying that we thought that the verdict was correct or that the department intended to relinquish its discretion to make its own judgment about the Mashpee status. Yeah. If there are no further questions, we would ask you to affirm the district court. Thank you, counsel. At this time, counsel for the Appali Mashpee Wampanoag Indian Tribe, please introduce yourself on the record. Sir, I'm sorry. We have one more speaker. The Appali for the Mashpee Wampanoag Tribe. All right. Thank you, your honors. Tammy Azorski for the Mashpee Tribe, and several of whom are here in the courtroom, several members of which are here in the courtroom today. I don't want to repave ground that we've already been over and don't want to repeat what Mr. Anderson said. But on the concept of the over focus in the rod of the Carlisle school attendance, the reality is that the students who attended the Carlisle school, there were at least a dozen students from 1905 to 1918. And they had to establish tribal membership, blood quantum, independently verified status, signed off on by someone of living in an Indian fashion. And that while they were there, the Carlisle superintendent, who was a federal official in the Office of Indian Affairs, they had to seek permission to leave. The superintendent controlled their funds. They had to seek permission from the Commissioner of Indian Affairs to transfer any funds. They made medical decisions about these students. And they used federal officials to provide services. And all of that are indicia of under federal jurisdiction. Counsel, suppose there had only been one student. First, I would say, Your Honor, there were more than one. But I don't think it would matter. Because of the nature of the Indian boarding schools, I think that would be sufficient. But that's not all we have. Going back, there are numerous federal reports going back to 1822. The Morse Report identifies Mashpee as, quote, within the jurisdiction of the United States. It was adopted by the Secretary of War. It was presented to President Monroe. The McKinney, and they ultimately recommended, the McKinney letters that are also in the record, recommended that the Mashpee not be removed. That they stay in Massachusetts. Those also were relied upon by the Secretary of War. There is the 1851 Schoolcraft Report, which was published pursuant to congressional direction. There is the 1890 Annual Report of Commissioner Affairs. And perhaps most importantly on this, in effect in 1934, there's the Gladys Tantacwidgen work. She was hired by the Office of Indian Affairs, you know, right before 1934. She conducted a lengthy study. And in 1935, that study was used to provide funding for a school for Mashpee students. And so that's sort of the bookend at that end of the evidence. But there's also the census evidence that is cited in our briefs. And as to the Collier letters that came out at that time, you know, 1934, the IRA was passed to correct past wrongs. And people, there was no list of recognized Indian tribes. People had a lot of different opinions. And as Mr. Anderson pointed out, that wasn't an official communication of interior. It was one person's opinion. Counsel, can I ask you a question? Because you mentioned the census data. I think your opposing counsel argues that it's not probative because it wasn't collected by the Office of Indian Affairs. Can you address that argument? Is there any legal authority supporting the notion that it has to be collected by the Office of Indian Affairs rather than the Director of the Census? Absolutely, Your Honor. First of all, the Carlisle census reports were prepared by an official of the Office of Indian Affairs. The general census, and there was also the 1910 Indian population schedule. And we simply, and that was under the 1884 Appropriations Act that identified certain individuals as Indians. And we simply disagree that it matters who conducted it as long as the census identified Indians. Counsel, going back to my questions of Mr. Anderson, from your point of view, the department's decision that as of 1934, there were sufficient indicia that tried being under federal jurisdiction to render the decision not arbitrary and capricious. And so we don't have to get into the other aspect of Justice Breyer's decision that you can come along later and correct a mistake. But that the Bureau can come around later and correct an earlier mistake. I think what Justice Breyer said is a tribe might have been under federal jurisdiction in 1934, but then the Department of Indian Affairs didn't understand that. And so, yes, I have to tell you, I have some doubts the entire Supreme Court would adopt that point of view. But regardless, you're saying we don't have to get into that issue because there is sufficient evidence as of 1934 to render the decision not arbitrary and capricious. That is correct, Your Honor. The tribe's view is that it's been fighting to keep its reservation for a long time now. They have a lot of things that are already on that site in terms of educational facilities and housing facilities and all these things. And all of that goes away if they weren't under federal jurisdiction in 1934. And there is a rational basis for Interior's decision that the tribe was under federal jurisdiction in 1934. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Thank you, David Tennant, on behalf of the Littlefield Plaintiffs and Appellants. To address some of these historical documents like the Morse Report, the Schoolcraft Report, if you actually read them, they identify Mashpee as among the Massachusetts fragmentary remnants of tribes.  And the other thing that's so important about those documents is they specifically call out the fact that the Board of Overseers in Massachusetts was the entity that was providing for the Mashpees and that according to these federal reports, which didn't result in any action, these federal reports noted that the Mashpees were in a happy circumstance with their Board of Overseers. With respect to Indian Census, the 1910 Indian Census was part of the general census. So it's anything like any other census. There's no jurisdictional act that's recognizable, that's significant by just enumerating the headcount of everybody in the country and you say, okay, these are people who self-identify as Indian. And the 1910 Indian Census would be a blunt instrument in any event because it wouldn't identify those Indians who were part of state-recognized tribes that aren't federally recognized and it wouldn't identify who are wards of the state versus wards of the federal government. It's a completely just all-in-one encompassing category of Indians. Counsel, can I just bring you back to the removal question? I'm just trying to understand your argument. If the evidence shows that federal officials were deliberating whether they should remove the Mashpee, that indicates that they thought they had the power to remove them, right? Otherwise they wouldn't be deliberating the question? Well, I guess that would be only one small step from plenary power where obviously the federal government post the adoption of the Constitution has the ability, the authority to inject itself into Indian affairs in the states. But it elected not to do that in the case of the Mashpees and the way of reading the Morse Report and the Schoolcraft Report and the McKinney Letters is that they're all recognizing that the Mashpees are being taken care of by the state and the federal government isn't going to do anything to change that. But I don't think that was the basis on which they decided not to remove them, was it? I mean, are you arguing that federal officials, high federal officials, would be deliberating whether to remove a tribe even if they didn't have federal jurisdiction, even if they weren't under federal jurisdiction? Is that your argument? Right, there's no... I think it's fair to say that the examination, discussion, and discernment about potential removal of Massachusetts Indians as a whole, there was nothing, to my knowledge, that was specific to the Mashpees, but the body of Massachusetts Indians and the category, the response from the federal government was they are being taken care of by the states. They are happy to be taken care of by the states. The federal government is happy to have them taken care of by the states because then they're not on the support obligation of the federal government. The federal government doesn't have to go out and spend money to remove them. So it's a very... to unexercise plenary power. Counsel, I think you may be making a broader point, which is it is true under the Constitution the federal government does have plenary power where over tribes, where it chooses to exercise it. And so you can't view this... If you say, if you rely on that plenary power, then you have eliminated the congressional test, which is that the federal... has to be under federal jurisdiction as of 1934. In other words, the existence of plenary power itself cannot be the correct test. And then you argue that this had to do with all Massachusetts tribes, not the Mashpee. And that's a good indication that this decision cannot be taken as a establishing of the federal choice to exercise and place them under federal jurisdiction. I think that's your broader argument. I would agree with you, Judge Lynch. I thought you would. Okay. Your time is up. Thank you. Thank you, Counsel. That concludes argument in this case.